**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

THOMAS G. WAMSLEY,

                Plaintiff,

v.                                   CIVIL ACTION NO.  2:10-cv-00990

LIFENET TRANSPLANT SERVICES INC., et al.

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant LifeNet Transplant Services Inc.'s and Defendant LifeNet Health's Motion to Dismiss Amended Complaint and a motion for costs and fees. [Docket 20.]  For the reasons that follow, the Court **GRANTS** Defendants' Motion to Dismiss Amended Complaint, **DENIES** Defendants' motion for costs and fees, and **DISMISSES** this case **WITH PREJUDICE** from the Court's docket.

*I.  BACKGROUND*

On March 22, 2010, Plaintiff sued Defendant LifeNet Transplant Services, Inc. and Defendant LifeNet Health—both Virginia-based, non-profit corporations. (Docket 1.)  Based on the parties' filings, it appears that Defendants are suppliers and distributors of human tissue products, such as human tendons. (Docket 1, 1-1, 21.)  Plaintiff's original complaint alleged that he underwent surgery to repair a rupture to the Achilles tendon in his left ankle, a procedure that involved the implantation of a human tendon obtained from Defendants. (Docket 1-1 at 3.)  Plaintiff alleged that "a defective 23.0 cm right Achilles tendon" was implanted into his left ankle and the tendon implant

was "infected." (*Id.*)   Consequently, Plaintiff had to undergo additional surgeries "to correct the damage caused by the defective tendon . . . ." *Id.*  Plaintiff claimed that Defendants' supplying an "infected tendon constitutes an unfair method[ ] of competition and unfair or deceptive act[ ] or practice[ ] as defined by W. Va. Code § 46A-6-102(7) made illegal by W. Va. Code § 46A-6-104."[1] (*Id.*)  Plaintiff sought to recover past and future economic and consequential damages, and fees and costs.  (*Id.* at 4.)

On August 12, 2010, Defendants moved to dismiss the complaint on the grounds that Plaintiff failed to allege "any action or inaction on the part of the Defendants which would constitute unfair competition, unfair acts or practices, deceptive acts or practices, or fraudulent acts or practices." (Docket 7 at 3.)  Rather, Defendants contended that Plaintiff "only formulaically recited the elements of a cause of action" under the West Virginia Consumer Credit Protection Act (WVCCPA). (*Id.* at 4.)  Defendants further argued that Plaintiff's WVCCPA claim is "a products liability claim in disguise" brought only because the statute of limitations had run on Plaintiff's traditional tort remedies. (*Id.* at 4.)

In ruling on Defendants' motion to dismiss (Docket 6) Plaintiff's original complaint, the Court noted that Plaintiff did not identify in his complaint the unlawful conduct in which Defendants allegedly engaged. The Court also noted that the complaint failed to establish any nexus between that unidentified conduct and Plaintiff's loss. (Docket 15 at 4.)  Thereupon, the Court denied Defendants' motion to dismiss without prejudice and granted leave for the Plaintiff to amend his complaint. (*Id.*)

---

[1] The pertinent provisions of the West Virginia Consumer Credit Protection Act are set forth in W. Va. Code §§ 46A-6-101 to -110.

2

On April 14, 2011, Plaintiff filed an Amended Complaint in which he added averments that Defendants "concealed from plaintiff, his doctors, and his hospital, that the tendon was infected." (Docket 17 at 2.)   He claims the alleged concealment

> that a tendon provided for human implantation is infected constitutes an unfair method of competition and unfair or deceptive act[ ] or practice[ ] as defined by W. Va.  Code § 46A-6-102(7) made illegal by W.  Va.  Code § 46A-6-104 in that, inter alia, it constitutes an act, use, or employment of a deception, fraud, false pretense, false promise or misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services.

(*Id.*)  Plaintiff further alleges that "but for the concealment, suppression or omission of the fact that the tendon was infected, Plaintiff would never have had the tendon implanted into his body" and that "as a proximate result of the concealment, suppression or omission of the fact that the tendon distributed by [Defendants] was infected," Plaintiff had to undergo additional corrective surgeries and sustained economic losses.  (*Id.*  at 2-3.)

Defendants then filed a motion to dismiss the amended complaint arguing that Plaintiff's amended complaint fails to meet the pleading standards articulated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   (Docket 21 at 3.) Defendants further contend that Plaintiff did not have a private cause of action under the WVCCPA because "no causal connection exists between the alleged unlawful conduct and the [Plaintiff's] ascertainable loss." (*Id.* at 4.)  More particularly, Defendants, relying on *White v. Wyeth*, 705 S.E.2d 828, 837 (W. Va. 2010), argue that because a physician (a "learned intermediary") made "the decision as to what product to use to repair [Plaintiff's] ruptured Achilles tendon," Plaintiff could not establish the necessary causal connection between the alleged unlawful practice by Defendants

and Plaintiff's injury. (*Id.* at 4.)  Defendants again argue that the only reason Plaintiff filed his claim under the WVCCPA was because the statutes of limitations on other causes of action had run. (*Id.* at 5.)

In response, Plaintiff argues that the "elements Defendants claim are missing . . . are not required elements of a claim under the [WVCCPA]" and that with respect to his averments of concealment, "[n]o further specifics are necessary to satisfy notice pleading." (Docket 25.)  He further states that in product liability cases, West Virginia has rejected the learned intermediary doctrine, and for several other reasons he urges the Court not to extend the reasoning in *White v. Wyeth* to the facts of this case. (*Id.*)

## II. DISCUSSION

### A.    Legal Standards

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint.  Fed. R. Civ. P. 12(b)(6).  While "the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1202 (3d ed. 2004)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570)).  A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then

4

determining whether those allegations allow the court to reasonably infer that "the defendant is liable for the misconduct alleged." *Id.* In other words, the factual allegations (taken as true) must "permit the court to infer more than the mere possibility of misconduct." *Id.* A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570. "The plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully' . . . [i]t requires the plaintiff to articulate facts, when accepted as true, to 'state a claim to relief *that is plausible on its face.*' " *Francis*, 588 F. 3d at 193 (quoting *Twombly,* 550 U.S. at 570). While a court must accept the material facts alleged in the complaint as true, *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim, *Iqbal*, 556 U.S. at ___. Facts pled that are "merely consistent with" liability are not sufficient. *Iqbal* at 1949 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. *Id.* (internal quotation marks omitted); *see also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Id.* The question of whether a complaint is legally sufficient

> is measured by whether it meets the standards for a pleading stated in Rule 8 (providing general rules of pleading), Rule 9 (providing rules for pleading special matters), Rule 10 (specifying pleading form), Rule 11 (requiring the signing of a pleading and stating its significance), and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted).

*Francis*, 588 F.3d at 192.

Pursuant to Fed. R. Civ. P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Allegations "must be simple, concise, and direct" and "no technical form is required." Fed.R.Civ.P. 8(d)(1). Where, however, a claim alleges fraud or mistake, a party must "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To satisfy Rule 9(b)'s heightened pleading standard, a plaintiff must allege facts establishing the "who, what, when, where, and how" of the claimed fraud. *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)(citations omitted).

Because Rule 9(b) applies to averments of fraud, the determination of whether its heightened standards apply depends on the complaint's factual allegations. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027-28 (9th Cir. 2005); *Cal. Pub. Employee' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160-61 (3d Cir. 2004)). In evaluating whether a cause of action must be pled with particularity, a court should examine whether the claim requires an essential showing of fraud. *Baltimore Cnty. v. Cigna Healthcare*, 238 F. App'x 914, 921 (4th Cir. 2007).

Fraud is a generous tort, encompassing affirmative misrepresentations and omissions alike, its boundaries limited only by the imaginations of crafty and unprincipled minds. *See Black's Law Dictionary* 731 (9th ed. 2009) (defining fraud as a "knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment"). A claim that "sounds in fraud" must satisfy Rule 9(b)'s more rigorous pleading standards. *Cozzarerelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) (stating that where claims have "the substance of fraud," Fed.R.Civ.P. 9(b) applies even though fraud may not be an element) .

6

Rule 9(b)'s heightened pleading standards advance several interests, including "protecting defendants' reputations from baseless accusations, eliminating unmeritorious suits that are brought only for their nuisance value, discouraging fishing expeditions brought in the dim hope of discovering a fraud, and providing defendants with detailed information in order to enable them to effectively defend against a claim." *Pub. Emps. Ret. Ass'n of Colo. v. Deloitte & Touche Accountants*, 551 F.3d 305, 311 (4th Cir. 2009); *see also* 5A Wright & Miller § 1296.  In *Harrison v. Westinghouse Savannah River Co.*, 352 F. 3d 908, 921-22 (4th Cir.  2003) the Fourth Circuit stated that

> Rule 9(b) has four purposes: First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Id.*  (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)).

A court should hesitate to dismiss a complaint under Rule 9(b) if the court believes that "the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial" and that the "plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784; *see also Dunn v. Borta*, No. 03–1362, 2004 WL 1110424 (4th Cir. May 19, 2004) (finding that where the complaint provided fair notice of the claims made against defendant, the fraud claims should not have been dismissed); *Westinghouse Savannah River Co.*, 352 F.3d 908, 921–22 (4th Cir. 2003) (same).

Pursuant to Fed.R.Civ.P. 11(b), a lawyer, when filing a pleading, motion, or "other paper," certifies that "to the best of [his or her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that "the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law" and that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(2) & (3). "A legal argument fails to satisfy Rule 11(b)(2) when 'in applying a standard of objective reasonableness, it can be said that a reasonable attorney in like circumstances could not have believed his actions to be legally justified.' " *Morris v. Wachovia Secs., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006) (citing *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153 (4th Cir. 2002)). "The legal argument must have absolutely no chance of success under the existing precedent" to contravene the rule. *Id.* (punctuation omitted). Factual allegations fail to satisfy Rule 11(b)(3) when they are "unsupported by any information obtained prior to filing." *Id.* (citing *Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991)).

Finally, in reviewing the sufficiency of a complaint a court may consider sources beyond the four corners of the complaint, including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" or sources "whose accuracy cannot reasonably be questioned." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (citation omitted).

8

B.      *Analysis*

      1.      *Plaintiff's Amended Complaint is Legally Insufficient under the Federal Rules of Civil Procedure*

Plaintiff's amended complaint fails as a matter of law.   In his amended complaint, Plaintiff states that his cause of action is premised on W. Va. Code §§ 46A-6-104 and 46A-6-102(7).  (Docket 17 at 2.)  Section 46A-6-104 provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Section 46A-6-102(7) lists sixteen separate illustrations of "[u]nfair methods of competition and unfair or deceptive acts or practices."   In his amended complaint, Plaintiff does not specify upon which sub-section of § 46A-6-102(7) he bases his claim.  It is clear, however, that Paragraph 9 of his amended complaint closely tracks the conduct proscribed in § 46A-6-102(7)(M).   Sub-section 102(7)(M) makes unlawful:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby.

Plaintiff's sole factual allegation concerning Defendants' alleged unlawful conduct is: "That the defendants LifeNet Transplant and/or LifeNet Health concealed from plaintiff, his doctors, and his hospital, that the tendon was infected." He offers not a single fact in support of his theory that Defendants concealed from surgeons the fact that the human tissue they provided was "infected" and knew that the surgeons would implant the diseased tendon into a human body. Indeed, the serious nature of this allegation makes it more at home in a criminal court than a consumer fraud action. Such an unadorned, conclusory averment leashed to not a single supporting fact fails to meet the

basic pleading standards announced in *Iqbal* and *Twombly*. As pleaded, Plaintiff's threadbare allegations are speculative, at best, and fail to permit the Court to infer plausible misconduct by Defendants.

Moreover, Plaintiff's allegation that Defendants concealed a material fact sounds in fraud and, thus, triggers rigorous pleading requirements under Fed.R.Civ.P. 9(b). *Jones v. Sears, Roebuck and Co.*, 301 F. App'x. 276, 287 (4th Cir. 2008) (unpublished) (stating that where a claim is brought under W. Va. Code § 46A-6-102(7)(M) "a plaintiff is obliged to plead *with particularity*" that a defendant has fraudulently misrepresented or omitted material facts); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 437 (7th Cir. 2011) (finding that, where plaintiff's consumer fraud allegations concerned misrepresentations and concealment, Rule 9(b)'s heightened pleading requirements governed); *In re Sony Grand Wega KDF-E A10/A12 Series Rear Projection HDTV Television Litigation*, 758 F. Supp. 2d 1077, 1088-89 (S.D. Cal. 2010) (finding that Rule 9(b) applied to claims relating to consumer protection statute and claims of consumer fraud); *Meserole v. Sony Corp. of Amer.*, No. 08 Cv. 8987 (RPP), 2009 WL 1403933 (S.D.N.Y. May 19, 2009) (same); *Thorogood v. Sears, Roebuck and Co.*, No. 06 C 1999, 2006 WL 3302640 (N.D. Ill. 2006) (same); *Archdiocese of San Salvador, v. FM Int'l,LLC.*, No. 05-cv-237-JD, 2006 WL 2583262 (D.N.H. 2006) (same); *Meadowlands v. CIBC World Markets Corp.*, No. 04 Civ. 7328(DAB), 2005 WL 2347856 (S.D.N.Y.2005) (same); *Nasik Breeding v. Merck & Co., Inc.*, 165 F. Supp.2d 514 (S.D.N.Y. 2001) (same); *Tuttle v. Lorillard*, 118 F. Supp.2d 954, 963 (D. Minn. 2000) (same).

This shoot-and-ask-questions-later lawsuit offends the policies underlying Fed. R. Civ. P. 9(b). "The clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned

through discovery after the complaint is filed." *Harrison*, 176 F.3d at 789.  Plaintiff offers no facts to support a good faith belief that Defendants knowingly distributed diseased or "infected" human body parts to Plaintiff's health care providers.  He offers nothing that would provide Defendants with sufficient information to defend against Plaintiff's claim: he provides no names, places, dates, or times, and no concrete facts to support the alleged conduct.  He offers no narrative on what was medically deficient about the tendon implant except to state that it was "infected."  Plaintiff offers no reason for the Court to infer that Defendants—and not some other entity or person in the chain—was responsible.  Fed. R. Civ. P. 9(b) is designed to require plaintiffs to conduct responsible pre-litigation investigation before filing suit.   Nothing in Plaintiff's complaint convinces the Court that this was done.  The Court's determination is buttressed by the fact that, in Plaintiff's responses to Defendants' motions to dismiss, Plaintiff's statement of the factual background of the dispute simply parrot the same unsupported conclusory allegations set forth in his pleadings.  As presented, it appears to the Court that there was no substantial prediscovery evidence of Defendants' alleged misconduct and that this case is a fishing expedition "brought in the dim hope of discovering a fraud." *Pub. Emps. Ret. Ass'n of Colo.*, 551 F.3d at 311. Nor does Plaintiff qualify his allegation of misconduct, as required by Fed.R.Civ.P. 11, by stating he will likely have evidentiary support for his claim after a reasonable opportunity for further investigation or discovery.

In sum, Plaintiff's theory of liability, as alleged, fails to cross "the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted). Where the crux of Plaintiff's claim is that Defendants concealed their knowledge that the human tendon implant they supplied to Plaintiff's physicians was "infected, and where Plaintiff offers no facts—concrete or otherwise—to support his allegation, his amended complaint fails as a

matter of law because it satisfies neither Rule 8's basic pleading standard, much less Rule 9(b)'s

heightened particularity pleading requirements that are required in this case.

> 2.      *Plaintiff's Claim is Not Cognizable under the West Virginia Consumer Credit Protection Act*

Even if Plaintiff's amended complaint were the model of perfect pleading under the Rules

of Civil Procedure, it would still fail because it does not state a cognizable claim under the

WVCCPA.

Pursuant to W. Va. Code § 46A-6-106:

> Any person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice prohibited or declared to be unlawful by the provisions of this article may bring an action in the circuit court of the county in which the seller or lessor resides or has his principal place of business or is doing business, or as provided for in sections one and two, article one, chapter fifty-six of this code, to recover actual damages or two hundred dollars, whichever is greater. The court may, in its discretion, provide such equitable relief as it deems necessary or proper.

Unlawful conduct under the WVCCPA is defined as "[u]nfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." W. Va. Code §

46A-6-104. As noted *supra*, § 46A-6-102(7)(A)-(M) lists sixteen illustrative types of  "unfair

methods of competition and unfair or deceptive acts or practices."  Pursuant to § 46A-6-102(2), a

"consumer" is "a natural person to whom a sale or lease is made in a consumer transaction and a

'consumer transaction' means a sale or lease to a natural person or persons for a personal, family,

household or agricultural purpose."

To state a private cause of action under W. Va. Code §§ 46A-6-106 and 46A-6-102(7)(M)

a consumer has to allege: 1) unlawful conduct by a seller; 2) an ascertainable loss on the part of the

consumer; and 3) a causal connection between the ascertainable loss and the conduct forming the basis of the lawsuit. Syl. Pt. 5, *White v. Wyeth*, 705 S.E.2d 828 (W. Va. 2010).

Plaintiff cannot shoulder his burden of stating a claim upon which relief can be granted because, within the meaning of the WVCCPA, the provisioning of blood and human tissue by the non-profit Defendants to Plaintiff's health care providers is not "trade or commerce";  the service provided by the Defendants was not performed "in connection with the sale or advertisement of any goods or services"; Plaintiff is not a "consumer"; and Plaintiff and Defendants did not enter into a "consumer transaction." *See* W. Va. Code §§ 46A-6-102(2), -102(7)(M), -104.

The West Virginia Legislature, in accord with many other jurisdictions, expressed its intent that suppliers of human blood and tissue products be held to different legal standards than those businesses that manufacture, distribute, and sell conventional goods and services. For example, nearly forty years ago, the West Virginia Legislature shielded distributors of human blood and tissue products from strict liability in tort and breach of warranty suits.  West Virginia Code § 16-23-1 provides:

> The procuring, furnishing, donating, processing, distributing or the using of human whole blood, blood plasma, blood products, blood derivatives, corneas, bones or organs or other human tissue for the purpose of injecting, transfusing or transplanting any of them in the human body, *is declared for all purposes to be the rendition of a service* by every person, firm or corporation participating therein, whether or not any remuneration is paid therefor, and *is declared not to be a sale* of any such items and *no warranties of any kind or description* shall be applicable thereto.

(emphasis added).   By broadly declaring "for all purposes" that blood and tissue distributors are rendering a service— and not making a sale—when they provide human blood and tissue products the West Virginia Legislature intended to limit the liability of such distributors in contract warranty and strict liability tort claims, plainly distinguishing human body products from ordinary goods.  This

statute reflects a legislative judgment that, in the absence of negligence or intentional acts, exposing procurers of human body parts, fluids, organs and tissue to liability would likely discourage the provisioning of life-saving and other critical medical services.  As one court explained, "[t]o ensure that such services remain adequate and affordable, legislatures have chosen to limit liability to defects that are the result of negligence, thus bringing the provision of such services necessary for medical treatment into the same category as the provision of other medical services. *Zichichi v. Middlesex Mem'l Hosp.*, 528 A.2d 805, 811 (Conn. 1987) (interpreting Connecticut's former blood shield statute C.G.S.A. § 19a-280) (provisions of repealed blood shield statute that exempted blood and human tissue procurement organizations from liability based on implied warranty theories are presently set forth in Connecticut's anatomical donation statute, Conn. Gen. Stat. Ann. § 19a-289q); *see also Cryolife, Inc. v. Superior Court of Santa Cruz*, 2 Cal. Rptr.3d 396, 402 (Cal. Ct. App. 2003) (stating that "the public policy in favor of promoting an adequate supply of blood militates against liability in the absence of negligence or intentional misconduct.").

This same legislative intent is also evinced in West Virginia's Revised Anatomical Gift Act. W. Va. Code § 16-19-1 *et seq*. There, the state legislature criminalized the purchase and sale of human organs, eyes and tissue. W. Va. Code § 16-19-16(a).  The Act also grants blanket immunity to any "person, including a medical examiner, who acts in accordance with this article or with the applicable anatomical gift law of another state, or attempts in good faith to do so [and such person] is not liable for the act in a civil action, criminal prosecution or administrative proceeding." W. Va. Code § 16-19-17.

In *Foster v. Memorial Hospital Ass'n of Charleston*, 219 S.E.2d 916, 920 (W. Va. 1975), the court addressed a claim of implied warranty against a hospital arising from the transfusion of impure

blood.  The incident occurred just prior to the enactment of West Virginia's blood shield statute, and

thus, the court analyzed the case under the law of warranty.  *Id.* at 918.  The court found that the

"great weight of authority" was that "a transaction involving the sale of blood is not a 'sale' creating

an implied warranty of fitness." *Id.* (citing *Perlmutter v. Beth David Hosp.*, 123 N.E.2d 792 (N.Y.

1954).  In rejecting the plaintiff's contention that the risk of infection from blood should be borne

by the defendant hospital, the court noted:

> Unlike standard commercial products, however, blood is dispensed under a wide
> variety of circumstances which do not lead to the imposition of the type of uniform
> standard of care envisaged by the law of warranty. In this regard blood which is
> manufactured in the human body can be distinguished from standardized drugs in
> that the latter are amenable to quality control by the manufacturer while human blood
> is obviously not. One can imagine a situation in which a patient needs a large
> quantity of blood over a protracted period of time, and in which blood is taken from
> one donor after another to be transfused almost immediately into the patient.
> Obviously under circumstances such as this the degree of 'reasonable care' necessary
> to protect the hospital from liability must be lower than in other circumstances
> because the exigencies of the situation demand speed, and the time necessary for the
> performance of tests is not available. Otherwise the hospital leaves the healing
> business and enters the insurance business.

*Id.* at 921.

In the case at hand, the Defendants are distributors— not a hospital or a physician; the human

product is an Achilles tendon—not blood; and the procedure, while intended to be life-enhancing,

was probably not necessary to sustain Plaintiff's life.  These distinguishing facts, however, do not

change the Court's view that the state legislature intended to proscribe the sale of human body parts

on public policy grounds and also broadly intended to limit lawsuits against those firms and

organizations that distribute human body fluids and parts.  Allowing Plaintiff to morph what is most

naturally a products liability or breach of warranty action into a purported statutory consumer

protection claim would permit an end-run around the state's blood shield statute. That tactic plainly subverts the state legislature's intended purpose in enacting W. Va. Code § 16-23-1.

This conclusion is buttressed by West Virginia's highest court's decision in *White v. Wyeth* 705 S.E.2d at 828.  In *White*, plaintiffs brought a class action under the WVCCPA. The plaintiffs alleged that the defendants, a pharmaceutical company and its marketing firm, used unfair and deceptive business practices in promoting hormone replacement therapy drugs to doctors and patients. *Id.* at 830-31, n. 2.  Plaintiffs claimed that the defendants used misleading statements in "advertising, marketing and labeling of the products." *Id.*  The Supreme Court of Appeals of West Virginia, answering a certified question from the trial court, found that where the WVCCPA claim involves affirmative misrepresentations, then a plaintiff must prove that he relied on the misrepresentation in order to satisfy the element of causation. *Id.* at 837. Where, however, the WVCCPA claim is predicated on concealment or omissions of material facts, a plaintiff proves causation "by presentation of facts showing that the deceptive conduct was the proximate cause of the loss."  In applying these principles to the facts of the case, the court found that "the private cause of action afforded consumers under West Virginia Code § 46A-6-106(a) does not extend to prescription drug purchases." *Id.* at 838.  The court stated that "[p]rescription drug cases are not the type of private causes of action contemplated under the terms and purposes of the WVCCPA because the consumer can not and does not decide what product to purchase."  *Id.*  The court reasoned that because a physician exercises independent judgment whether to prescribe a particular medication consumers have a protective buffer that is non-extant in advertising campaigns for other products. *Id.*  Additionally, the court noted consumer protection laws were never intended to encompass industries that are closely monitored and regulated by a federal government regulatory scheme. *Id.*

16

Plaintiff contends that *White* has no application to his case.  (Docket 25 at 4-6).  His reasons are not persuasive.  First, Plaintiff argues that *White's* holding that prescription drug cases fall outside the ambit of the WVCCPA is "essentially dicta" because that determination was unnecessary to answering the certified question posed to the court by the trial judge. (*Id.* at 4.)  The West Virginia Supreme Court's determination that prescription drugs cases are exempted from the WVCCPA is hardly obiter dictum: the court characterized its finding as a "new point of law." *White*, 227 S.E.2d at 838.   Indeed, the "new point of law" was made a syllabus point in the opinion.[2] Syl. Pt. 6, *id.*

Similarly unpersuasive is Plaintiff's additional contention that "this Court should be hesitant to expand the *White* holding" because "two of the five active members of the court" were not members of the panel.  Under West Virginia law, a decision from the West Virginia Supreme Court of Appeals is binding authority where three or more justices concur in the decision. W. Va. Const. Art. 8, § 4 ("No decision rendered by the court shall be considered as binding authority upon any court, except in the particular case decided, unless a majority of the justices of the court concur in such decision.").  *White* was unanimously decided by three-member panel of the court.  Plaintiff tenders no rule or law to support the notion that court opinions delivered by a panel comprised in part of jurists sitting by temporary designation lack precedential authority.  Logic dictates that, as in the federal system, a state court judge sitting by temporary assignment has concomitant powers

---

[2] Article VIII, section 4, of the Constitution of West Virginia provides:

When a judgment or order of another court is reversed, modified or affirmed by the court, every point fairly arising upon the record shall be considered and decided; the reasons therefor shall be concisely stated in writing and preserved with the record; and it shall be the duty of the court to prepare a syllabus of the points adjudicated in each case in which an opinion is written and in which a majority of the justices thereof concurred, which shall be prefixed to the published report of the case.

to decide or join in opinions of that court. *See* 28 U.S.C. § 296 (stating that, with the exception of

two specified ministerial tasks,"a [federal] justice or judge shall have all the powers of a judge of

the court, circuit or district to which he is designated and assigned during the period of temporary

assignment).  In the absence of any state law or rule limiting the precedential weight of opinions

joined or written by judges serving by temporary designation, and in light of *White's* persuasive

reasoning, the Court rejects Plaintiff's contention.

Plaintiff also contends without elaboration that while *White's* reasoning that the intervention

of a physician in the decision-making process "may makes (sic) sense in the context of a failure to

warn case . . . it loses its persuasive value in the context of a case where the service results in a

provision of tissue that is not what the physician intended to implant—tissue free from infection."

(Docket 25 at 5.)

This reasoning is unconvincing. *White* stands for the common-sense proposition that where

there is a protective intermediate decision-making buffer the patient-consumer is insulated from the

wrongs the WVCCPA seeks to redress.  In *White*, it was a physician who made the decision what

product the patient-consumer purchased.  And "because the consumer can not and does not decide

what product to purchase," the court found that the physician's intervention in the consumer's

decision-making process severed any causal connection between the defendants' conduct and the

plaintiffs' injury. This fact, along with the high degree of federal regulation of the pharmaceutical

industry, caused the court to determine that the state legislature did not intend to extend a private

cause of action under the WVCCPA relating to prescription drug purchases.  *Id.* at 838.  After all,

a purpose of the WVCCPA is, among others, to "protect consumers who purchase goods or services

for cash or credit from, and to give them remedies for, defective or shoddy goods and services and

18

unfair and deceptive selling practices." *State ex rel. McGraw v. Bear, Stearns & Co., Inc.*, 618 S.E.2d 582, 587 (W. Va. 2005) (quoting Vincent P. Cardi, *The West Virginia Consumer Credit and Protection Act*, 77 W. Va. L. Rev. 401 (1974-75)).

Here, based on the averments in his complaint, Plaintiff, like the plaintiffs in *White*, was not a consumer who was left to tackle on his own the complex medical decision as to which tendon implant was medically appropriate and which human tissue procurement organization to utilize. Rather, those decisions were undoubtedly made entirely by Plaintiff's health care providers. There is no principled difference between carving out an exception for liability under the WVCCPA for a physician who determines which drug to prescribe and a physician who decides which human blood or tissue products are medically appropriate and safe.

Finally, in *White* the Court noted that a pertinent factor in deciding whether a claims falls within the scope of the WVCCPA is whether the safety of the product is already closely monitored and regulated by the government. *Id.* at 838. Mortgage lenders and brokers, pawnbrokers, insurance sales, regulated public utility transactions are expressly exempted by W. Va. Code § 46A-1-105. Investment advisors, too, are exempted. *State v. Bear, Stearns & Co., Inc.*, 618 S.E.2d 582, 588 (W. Va. 2005)(finding that securities industry is "so pervasively regulated by the federal government" it is doubtful that the legislature "intended to give securities investors an added measure of protection above that already provided by the various" federal and states laws.).

One rationale underlying the relevance of this "regulated industry" factor is that "government enforcement or administrative systems are preferable to civil litigation" in that government enforcement "allows publicly-accountable officials to determine policy" and offer an "effective screening mechanism for claims that are without merit in law or fact." Victor E. Schwartz, Cary

Silverman, Christopher E. Appel, "*That's Unfair!" Says Who—The Government or the Litigant?:*
*Consumer Protection Claims Involving Regulated Conduct*," 47 Washburn L.J. 93, 101-02 (2007).
Where regulatory agencies have the power to enforce a range of civil and criminal penalties in order
to achieve compliance, these "well-developed procedures fall to the wayside when claims falling
within the jurisdiction of the agency go straight into the judicial system." *Id.*

The procurement of human blood, organs and tissue is highly regulated by state and federal
authorities alike.  *See e.g.*, W. Va. Code § 16-19-15 (requiring hospitals to enter into agreements
with procurement organizations for procuring and use of anatomical gifts); *id.* § 16-19-14 (setting
forth the rights and responsibilities of human organ and tissue procurement organizations and
others); *id.* 16-19-17 (providing immunity for persons complying with statute); *id.* § 16-19-19
(permitting the division of motor vehicles to establish or contract for a donor registry and requiring
any registry to be accessible to procurement organizations twenty-four hours a day, seven days a
week); *id.* 16-19-21 (requiring cooperation between the state medical examiner and procurement
organization); *see also e.g.*, 42 U.S.C. § 262 (regulating biological products; establishing licensing
requirements, facility inspection rules, and civil and criminal penalties); *id.* § 264 (regulating the
transmission and spread of communicable diseases); 42 U.S.C. § 273-274g (regulating organ
procurement organizations and related matters; providing criminal penalties for sale of human organs
for transplantation); 21 C.F.R. §§ 1270.1-43 (regulating human tissue intended for transplantation
to a human for the diagnosis, cure, mitigation, treatment, or prevention of any condition or disease;
establishing required testing procedures for viruses and infectious diseases and record-keeping
procedures; and authorizing Federal Drug Administration inspections of human tissue establishments
covered by the regulations).  Thus, where extensive state and federal regulatory schemes cover

human blood, organ and tissue procurement organizations, compelling public policy reasons—including maintaining consistency in federal and state regulatory goals and the availability of alternative fora for addressing consumer complaints such as Plaintiff's—all weigh in favor of exempting Defendants' alleged conduct from the WVCCPA. *See* "*That's Unfair!" Says Who—The Government or the Litigant?: Consumer Protection Claims Involving Regulated Conduct*," 47 Washburn L.J. at 101-02

Finally, Plaintiff, correctly noting the legal unavailability of a products liability action, contends that if his WVCCPA complaint is dismissed, he will be left with no adequate legal remedy. (Docket 25 at 5.)  It is true that the WVCCPA was intended "to protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action." *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 461 S.E.2d 516, 523 (W. Va. 1995). Here, however, any difficulty Plaintiff might having pursuing more traditional causes of action is likely his own fault.  Defendants claim that the reason Plaintiff brought his WVCCPA claim is because he failed to pursue negligence and medical malpractice claims in a timely fashion. (Docket 27 at 4.)  The legislature, however, did not intend that WVCCPA serve as a Plan B litigation backstop for *ultra vires* consumer claims when a plaintiff had—but squandered —appropriate traditional causes of action.

### III.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss Amended

Complaint [Docket 20], **DENIES** Defendants' motion for costs and fees, and **DISMISSES** this case **WITH PREJUDICE** from the Court's docket.

       **IT IS SO ORDERED**.

       The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

                     ENTER:       November 10, 2011

                     THOMAS E. JOHNSTON
                     UNITED STATES DISTRICT JUDGE